Case number 13-1899, Saab Automotive, AB and Others v. General Motors Company. Arguments not to exceed 15 minutes per side. Mr. Chu for the appellants. Thank you very much. Good morning, your honors. May it please the court. Ben Chu for appellants Saab and Spiker. With me today is Victor Mueller, who is the CEO of both of the plaintiffs' appellants here, and who would respectfully seek to reserve three minutes for rebuttal. As the court is aware, this is an action for tortious interference with business expectancy v. Defendant Appley, GM, which intentionally quashed Saab's framework agreement with Youngman on false pretenses. We respectfully submit that the district court erred. First, the framework agreement shows a valid business expectancy, specifically pursuant to section 1, page 5 of the framework agreement. Youngman was to provide an immediate cash infusion of 10 million euro, which would have saved the company, which otherwise went bankrupt the very next day. It was that payment, your honors, rather than the framework agreement itself, which constituted the valid business expectancy. And we respect, yes, your honor? In that framework agreement, wasn't there a requirement, or at least a condition, that there be several other agreements effectuated before there would be this infusion of cash? And if that's the case, how can you argue that there was this immediate expectancy? Your honor, the page 5 of the framework agreement says that the 10 million euro was an immediate. That was to take place on December 16th. Your honor is absolutely correct that for the first 200 million, the remaining 190 million, other agreements had to be made. And contrary to what Appley says in their papers, those agreements did not have to be made over the weekend. There was a deadline in the framework agreement of December 31, 2011, which gave the parties sufficient time to make those agreements. Moreover, again contrary to what GM has said in its papers, the regulatory approvals that were contemplated, there was no deadline in the framework agreement. But the framework agreement provided that the 10 million dollars was immediate and unconditioned. And you argue that that 10 million, was it 10 million dollars or 10 million euros? 10 million euros. And you're arguing that the 10 million euros would have prevented the bankruptcy. Would have prevented what happened the next day. And your honor raises an excellent question, one we think for discovery, as to what would happen after that. And there certainly were things that had to happen, but it's our position that we had sufficient time to do that. But when you pled this, and I don't have the complaint in front of me at the moment, when you pled this, did you break it out that way or did you plead the framework agreement as a package? Well, your honor, I think it's, I think a fair reading of the complaint is it's both in there. That the framework agreement itself was evidence of the business expectancy, which contained an immediate 10 million euro infusion. And that's more tangible, as your honors know, than what was deemed to constitute a business expectancy in Wolf Capital, which wasn't even reduced to writing. This was a very sophisticated document prepared over several months, in which GM was involved. Remember, your honor, that GM was involved. Mr. Mueller had negotiated several deals with Youngman and others during that summer, and kept in constant contact with GM. And GM kept vetoing them, saying, no, you're going to use legacy technology. No, this Chinese entity is going to have some ownership interests. So finally, Mr. Mueller said, fine, we will draft something that makes it very clear that no GM legacy technology will ever be seen or owned by Youngman. And that the joint venture will not become a joint venture, in which the loan converted and Youngman became an equity interest, unless and until the ATLA and the VSA expired. And unless and until Saab developed its own technology, the Phoenix platform. And that is crucial, your honor, because the agreement was drafted very carefully that the Chinese would have no access to the technology and no ownership of it. And if, unless and until the Phoenix platform, which was all Saab's technology, there's no dispute about that whatsoever, your honor, it was only upon those contingent events that the joint venture would come into being. For you to proceed further, you have to show not only there was a valid business expectancy, but that there was intentional act on the part of GM, right? That is true. And doesn't GM, as a public corporation, have the right to discuss publicly what sort of goings-on might be valid for potential shareholders? Well, your honor, there is, as your honor is aware, there is a conditional privilege. But it doesn't apply here because these weren't, the fair comment conditional privilege doesn't apply, whereas here, the parties were not proper parties. And it was not disclosed in a proper manner to proper parties here, proper parties only. We would respectfully submit that the proper parties here were Saab, Spiker, and Youngman. It would have been one thing if Mr. Mueller had said, look guys, I don't think this does what you need it to do. Instead, what they did is they went out and they made a public press release. And then to twist the knife even further, your honor, they gave an interview to a Swedish newspaper where they made false statements. And these are small false statements of fact, not opinion. What was the most egregious false statement they made? They, I think there are three, if I may, if I may, Judge Seiler. Three, that's even better for you. One, they said that the framework agreement was not meaningfully different and entailed a change of control and or ownership. They knew that was wrong. They were intimately involved in the process. They knew that this was a brand new agreement. Two, they knew full well that the framework agreement did not entail a change of control and or ownership. I mean, if your honor has read, and I know your honor has, the framework agreement, they bent over backwards to make clear that under no circumstances could the framework agreement be construed to give young men ownership of or access to the legacy technology. Because we all submit, we all stipulate that the ATLA makes it clear that that can't happen. But if the framework, as I understand it, if the framework agreement was going to result in a 70% ownership interest by the young men, wasn't that going to give him a controlling interest? And wasn't that in fact going to change the position of GM with respect to its ownership interests? How could you have somebody owning 100% of whatever and then somebody having 70% but that not change anything? It would only change, your honor, upon the expiration of the VSA and the ATLA. And theoretically, that could have gone on if GM had wished. One of those agreements could have lasted till 2024, in which case there would have been no change of control until then. So this was a contingent deal. These were hypothetical situations which may not have come to fruition and young men took that risk. But may have come to fruition. And so that seems to me to hurt your argument that GM made some kind of, I guess, materially inaccurate statement. Well, your honor, it was inaccurate and they knew that it was inaccurate to say that this was just like all the other deals and that the change of ownership had taken place, the change of control had taken place. They knew very well that the change of ownership had not taken place and had not commenced. There is, we have a dispute here on the meaning of the word to commence. It means to begin. The change of ownership never began. If, for example, Saab had never been ready to roll out the Phoenix platform, young men wouldn't have gotten anything. They wouldn't have gotten any ownership interest. They wouldn't have gotten anything out of the deal and they were willing to take that risk because that's the only way. And GM made it extremely clear that the only way this was going to work is if the VSA and the ATLA were not implicated. So there was no change of control. It never began or commenced. And you're saying that the GM statement itself specifically says that the change of control had occurred. Yes, and that was that was crucial. And the other false statement in answer to Judge Seiler's question was James Kane. This wasn't an accidental statement. This was GM's official spokesperson. And another thing that he said is that they could no longer provide the legacy technology under the VSA. And that meant that Saab was out of luck. That was a way to twist the knife. They didn't have that right under the VSA. They only had that right under the VSA if that change of control or ownership had taken place or if young men had access to the technology. They knew that was a lie. And that's not proper. They're not allowed to do that. And that was the knife that they stuck in the back of Saab. They knew exactly what they were doing. You're saying that GM was just wrought with some sort of retaliation that they issued these public statements that were false just to damage Saab or damage young men or damage somebody. They must be after someone like a person is in politics. My opponent's doing this and making up lies about him. We can't speculate entirely as to their motives. And we don't believe, Mr. Mueller doesn't believe that there was any personal animus. In fact, he had good relations with GM. I think what the motive was as far as what they publicly stated. GM didn't want Saab. They got rid of him. That's it. They didn't want Saab competing in the Chinese market. There were all kinds of contemporaneous statements by the same spokesman, James Cain, and in the annual reports of GM that the Chinese market was absolutely crucial to GM. They sold more Buicks in China than they did in the United States. This was a way to keep Saab out of the Chinese market. So it didn't have to be personal animus. It was a business reason which was improper only because it was a complete and knowing misstatement of what the framework agreement did. And they waited till the last minute and they sprung that on Spiker and Saab. And your honors, that's what is tortious interference with business. And I think that's where, with respect, the district court went wrong because it concluded in interpreting the contract that GM's reading of the contracts were correct. And therefore, if that had been true, then I would agree there was no malice. But it's clear, your honor, that they did misread the contract. And if I could just in my remaining few seconds before my three minutes of rebuttal, the framework agreement says, quote, the change of control would occur only upon, quote, the start of sale of the vehicle version based on the Phoenix platform, whereby Saab no longer has a need to rely upon technology granted by GM. That's in the framework agreement at section 7, page 11, record 1-4, page 113. I don't know how anybody could have drafted that more clearly. Remember, it is undisputed that the Phoenix platform was developed solely by Saab. And it was only if that Phoenix platform was prepared and ready for sale that Youngman, the joint venture, would come to fruition and they would have ownership, part ownership, of that. But that had nothing to do with GM legacy technology because by that time, the ATLA and the VSA would have been extinguished. And Youngman was willing to wait for that and willing to wait for the possibility that it would never come to fruition. Thank you, your honors. Thank you, counsel. Good morning, your honors. I'm Catherine Kirmire, representing General Motors. I want to start with the question of whether the package of transactions with Youngman, as reflected in the framework agreement, would have initiated a change of control. In February of 2010, Saab, Spiker, and GM negotiated a complex set of agreements reflecting the sale of Saab. These were three sophisticated corporations and the various agreements they executed back then reflected that sophistication. One of those agreements was the ATLA and the Automotive Technology License Agreement. And in that agreement, in section 12.3, Saab agreed that GM could terminate its technology licenses, which were necessary for Saab to be able to continue to make and sell its existing line of cars. Saab agreed that GM could terminate those licenses immediately upon even the start, even the initiation of a sale of assets or a change of control. And importantly, your honors, the clause refers to a change of control of the company, not a change of control in GM's IP or licenses only on an actual sale or an actual change of control. Saab agreed that GM didn't need to wait for that, that it could terminate as soon as an action was initiated. Importantly, Saab also did not say that GM could terminate only if the change of control, the actual change of control, would happen during the license terms. Saab agreed that GM could terminate at the initiation of the change without regard to whether or when an actual change of control would happen. And Saab did not require that GM had to have any particular reason or justification for exercising that discretion. There were no limits placed on GM's ability to terminate. GM could terminate for any reason. This is what Saab and Spiker agreed to when they purchased Saab from GM. Mr. Chu claims that they were ready to use this Phoenix platform. They didn't have to depend upon GM at all. Is that correct? The argument is that, now remember, Youngman and Saab and Spiker had tried four times to structure a deal that would not have triggered this contract right in 12.3. The deal they ultimately came up with on the night before the bankruptcy hearing did provide that the last vestige of Saab, the part of it that used the GM technology, would not transfer to Youngman until, I think the word is they started producing their own cars. So it was structured to try and spring up after the licenses would have expired. That was the way the lawyers tried to get around it. The problem was, I think there's two arguments about initiate here, Your Honor. The first is the right that Youngman got to have that 70 percent equity interest spring up was created and defined and set forward in the framework agreements and the other contracts that were required to go along with that. That would have happened as of the day those deals were signed. That in and of itself is initiation. That's the start. It's not the actual change of control, but it's the start. But Your Honor, there's much more, if that was the only thing that the parties had agreed to on December 16th in the set of framework agreements, that itself would be an initiation. On those framework agreements, and counsel talked about there was going to be an infusion of 10 million pounds, but didn't the framework agreement contemplate or require actions by the European Bank, the Swedish National Debt Office, and the Chinese National Development and Reform Committee to all agree on something over about a two-week period in order to effectuate this FAA agreement? Yes, Your Honor. This argument that we heard this morning about the $10 million being the expectancy, the immediate $10 million was not pled below. It's not alleged in the complaint. The framework agreement was finalized on the afternoon of Friday the 16th. It was finalized on that day in the afternoon. It was not executed on that day. It required 10 additional contracts be negotiated and executed as part of a package. It stated on its face that all of that, it was the party's intent that all that be done by the following Monday, because on Monday, the bankruptcy administrator, who Saab and Youngman had no control over, had said that he was going to put the company into involuntary bankruptcy. So Youngman and Saab and Spiker understood that it had to be done by the 16th. Now, in addition, there are the regulatory approvals. Saab needed to obtain the approval of the National Debt Office of Sweden, needed to get the approval of the bankruptcy administrator, and needed to get the approval of the European Investment Bank, which, by the way, the complaint alleges had previously declined to grant approval to a different transaction that Saab was proposing. More importantly, Youngman had to get a series of approvals from various Chinese government regulatory agencies. And in the briefing, Saab suggests that those approvals didn't need to happen before the 2014, that the preconditions to closing include regulatory approvals, and regulatory approvals are defined in the next line as all of the Chinese governmental approvals. Now, the fact that Saab and Youngman may have given themselves 10 extra days, you saw in the briefing, they said, well, the bankruptcy hearing was set for the 19th, but we agreed in the framework agreement that neither side could walk away, provided we got the deal done by the 31st. There's no allegation that the bankruptcy administrator would have gone along with that. There's no allegation absolutely at all that that would have been acceptable to the government of Sweden. So to say that we had agreed that we could give ourselves more time isn't the point. They were against the gun of the bankruptcy administration. While I'm on the sort of unlikely, unlikeliness of the expectancy, I do want to talk about the 10 million, sort of a new pre-expectancy I heard about for the first time this morning. A couple facts about that in the complaint. First of all, Mr. Chu alleges that that would have been paid on December 16th. December 16th was the day that the framework agreement was finalized. GM didn't make the two statements at issue in this case until December 17th. So obviously, the money hadn't been paid on December 16th, for reasons that we don't know. It's not in the complaint. They've never focused on this 10 million before, but it didn't happen. Reasons I think it may not have happened, we do see... made until the 17th. The statements are alleged on complaint paragraph 128, which is page ID 21 and 22, and then complaint paragraph 132, page ID 22, and I believe the date of December 17th is reflected in those complaint allegations. At the district court level, the court appeared to go through a legitimate business reasons analysis. Did the court err in that analysis? And if the answer is no, was the analysis sufficient and complete under Michigan law? I think, Your Honor, that the court... The legitimate business analysis really drove from the finding that the contract right was, as GM said. The court concluded that GM did... That this set of transactions did initiate a change of control, and therefore, GM did have the right under the ATLA to terminate. And therefore, its statements to that effect couldn't be false and were a legitimate exercise of business. I don't think the court went much further than that. I think what Your Honor is getting at is sort of a question about the legitimacy of business motives. Is that a little murky? Does it get a little factual? Is there a factual dispute? I don't think that Judge Drain got there, and I don't think this court needs to get there. I think there's sort of a number of independent legal defects in this case before you get there. I will say that the complaint, and we made the argument below, although we didn't rely on it, the complaint is devoid of any allegation of improper motive other than the allegation that GM didn't want its competitors in the Chinese marketplace to get access to its is not a fact that if proven would establish the kind of fraudulent or unethical or wrongful kind of motivation that generally is required for tortious interference. But I do want to come back to the initiation because I think it's an important point. Saab would like the court to focus on the world as if there was the world on December 17th when these contracts were executed, but nothing would happen as far as Youngman was concerned. For years and years, Youngman would sort of take a seat in the bleachers and do nothing with respect to controlling Saab until such time as Saab started producing its own cars. And that's quite actually far from the way the framework agreement was structured. In fact, the rest of the framework agreement, all of those other contracts that needed to be negotiated and signed, described a whole series of events that would happen immediately, every single one of which involved transferring from Saab to Youngman assets and rights and control to the parts of Saab that didn't touch on GM's IP. And it's worth citing them, Your Honor. Certainly in the preface of the framework agreement, paragraph F, which is on the first page, page ID 103, it refers to the goal is to get to Youngman from Saab all of the technology that can be transferred. And the to transfer all the parts to Youngman except the General Motors intellectual property. But then if you look at the list of other contracts that needed to be negotiated immediately, there's at least five of them worth noting. Before the framework agreement, Saab and Youngman had already formed a joint venture. It's referred to in the framework agreement as JVB. And they each owned 50% of it. So anything that was contributed to that joint venture, Saab immediately had control of 50% of. So in the framework agreement, the proposal was that there would be a share transfer agreement pursuant to which Saab would transfer all the shares in Saab Powertrain. It's contributing an entire company into the joint venture, relinquishing 50% of the ownership. There was an asset transfer agreement. Saab transfers all the assets of Saab Engineering, another corporate entity that did all the engineering of the Saab vehicles, transferred immediately into the joint venture. There's a JVB technology license agreement. Saab licensed all of its remaining technology, everything not covered by the GM licenses, to the joint venture. And then there's a trademark license agreement and an agreement called the TLA-3, which also the execution of which, by the way, was supposed to happen on December 16th in exchange for the 10 million euros. And there's no allegation that that happened. The framework agreement further provides that notwithstanding that Saab had 50-50 ownership with Youngman of this joint venture, Youngman would get 70% of the dividends from the joint venture. Saab promised exclusivity. Saab promised to Youngman that from that day forward it would not make any other cars except through the joint venture. And with respect to the joint venture board of directors, there were three members Youngman got to appoint to, including the chair. Last but not least, the framework agreement stipulated that Youngman immediately got to appoint a director to the Saab board and Youngman got to establish a supervision committee to supervise all of Saab's activities. That's on page ID 113. In short, everything that could be done to transfer control of the Saab company to Youngman. The final step, the 70% equity, was the right to that was established. There's no interpretation of initiate that would not capture this scenario. In my two minutes left, I want to address the question about whether GN statements could reasonably be construed as statements of fact. At this stage of the pleadings, we have to go with the plaintiff's interpretation of the statements, but they are worth reading. They don't actually say literally what they're construed to say. But for the purposes of the motion, we interpret them to mean that GM said, I have a contract right to terminate my license if you proceed with these transactions. I believe that that's a statement of legal position, your honors. I don't believe that's a statement of fact. But importantly, in this context, we have to focus on the context in which the person at whom those statements were directed would have heard them. This is not a case in which GM appeared out of the blue, an unknown entity, rode up on a horse and said to Youngman, hi, I'm General Motors and guess what, I have a contract and it gives me the right to terminate the Saab licenses if you proceed, which would have been a fact. Youngman, quite the contrary, knew full well about the existence of GM, about the existence of GM's contractual relationships with Saab, and had spent the last six months with its lawyers trying to craft an agreement that would pass GM's approval. Four prior agreements between Saab and Youngman had been submitted to General Motors and General Motors had declined to consent. Youngman knew about this consent right. In that context, there's simply no way that Youngman could reasonably have interpreted the two statements General Motors made as anything other than a statement of their legal position. What was the occasion for the release of this, just a press conference or? It was just a press release. The matter of the Saab bankruptcy was of great interest in Sweden and GM had been asked for press releases all along the way. Their position was, or was that what it was, it was an inquiry with General Motors? It was a general statement that the Saab's new proposals were not significantly different from the ones that had previously been submitted. Was it a matter of public knowledge that GM had turned down the previous agreements or? I believe it was, Your Honor. I'm not sure whether that's in the complaint. What is in the complaint is the fact that, of course, General Motors had $375 million of preferred shares in Saab. General Motors had a significant interest in the company and the company was in voluntary reorganization. So even apart from its contractual relationships with Saab, GM certainly had an interest and the bankruptcy administrator would have known GM was a stakeholder. So that's why people were interested in what GM's position would be. I see my time is up, Your Honors, unless you have any other questions. Very briefly, Your Honors, I just wanted to clear up a couple of inadvertent misstatements by GM's counsel. We absolutely pled that the Euro 10 million infusion was immediate and I point the Court to Record 1-4, page 107, the framework agreement which is attached to and incorporated in the complaint. Payment, Euro 10 million payable by December 16, 2011. That was immediate payment. Counsel says, though, that whether that was pled or not, it wasn't paid. It wasn't paid, but it was due and the payment would have been made. Well, didn't that 10 million, though, depend upon the execution of TLA number 3, which incorporated the requirement for some other things to happen? Your Honor, we believe that that TLA 3 and other agreements had to be done by closing, and I point the Court to RE 1-4, page 106, unless closing has taken place by 31 December, 2011, Saab and YM, Youngman, may each terminate the agreement. And with respect to one of Judge Seiler's questions, and again, I think this is obviously an inadvertent misstatement, it wasn't just a generic press release. They did a press release, but they also went out of their way to give an interview to TTLA, and they didn't just say, we think that our legal position is that we believe this violates our agreements. The official GM spokesman said, the framework agreement is not in our interest in our global operations. When pressed on what GM meant by global operations, Mr. Kane responded that GM's activities in China were particularly important. So I think it wasn't just a generic, gee, we're making a statement we have to make. They went out and sought that publicity. But very quickly, again, I go back to the framework agreement, paragraph 7. The joint venture did not come into being, could not come into being, until the start of the sale of the vehicle version based on the Phoenix platform. That may never have taken place. That's when the joint venture would have begun. That didn't occur, nor did it begin. It would begin when Saab rolled out that Phoenix platform, which it never did. And Ms. Kirmire also notes that GM has stipulated for purposes of this appeal that all of the allegations regarding the purpose and intent of the framework agreement are taken as true. And that is significant, and it's also consistent with the party's choice of not in the event of ambiguity, but in construing the party's language itself. That's how much they wanted to make sure that this didn't run afoul of anything in the agreement. And GM's position is basically because they had these agreements, they could tie up Saab forever. And that's not how it works. Parties routinely negotiate for things to happen in the future. This didn't give them ultimate veto rights no matter what. And the fact that GM was intimately involved in the process proves our point. They were taking the position that no matter what they did, they were going to crush Saab and prevent there from being any competition in China. Counselor, your time has expired, but let me just ask one question. Your adversary here says that the ATLA gave GM the right to terminate if Saab even initiated a sale or change of control. It allowed them to do that if the change of control began. But the language in the contract certainly does say initiates a change of control or initiates a sale of the assets. And it is true, I think, that the contract doesn't define initiates, but nothing can begin until it's been started, essentially. So the concern that I have is, how would you have that sale actually begin if it wasn't initiated? Your Honor, I think we have the same position, unless I misunderstand. The sale, the joint contingent event, which is the rollout of the Phoenix platform, that may never have happened. So GM's position is somehow that this agreement initiated or started a change of control when, in fact, that may never have taken place. That would only take place after the expiration of the agreements with GM. And once they had the Phoenix platform, that was a contingent event. So I don't think you can say that something started when something may never take place at all. This was a contingent agreement. I think once the Phoenix platform started rolling out... I guess my next question is, with that kind of a dispute about what the contract language means, what is the standard here? We're here on a 12b-6. Is that a factual issue? I absolutely believe it's a factual issue, which should not be resolved in a 12b-6 motion. And that's why their stipulation, Your Honor, is so important. They stipulate that our interpretation of the language and our interpretation of how the language of the framework was going to work should be taken as true, not for purposes of the entire case, but for purposes of a 12b-6 motion. And also, again, it goes back to their choice of substantive law of Hong Kong and Swedish law. That sounds bizarre. Why did Mr. Mueller choose that? They chose that because they have a very clear understanding that when the court looks at the language of the framework agreement, they have to look to the intent of the party. So that if they made a drafting error, the court not only should, not only may, but should consider and interpret in such a way that it would not run afoul of the YATLA or the VSA. So we absolutely submit, Your Honor, we're not saying that GM submits to liability or that or submits that we're right on the interpretation, but they do submit that we're entitled to the benefit and it should not be resolved on 12b-6. And if I could just say one thing on causation. Paragraph 140 of the complaint, RE1 at 2-3, Rachel Pang of Youngman stated contemporaneously, quote, we, Youngman, were supporting Saab and Spiker to the last moment, ellipsis, but due to GM's position, in the end, Sweden's Saab filed for bankruptcy this morning. This is a contemporaneous statement in the press by Youngman, not some after the fact statement designed to create a lawsuit. Thank you very much, Your Honor. Thank you, counsel. It's a really interesting case, and it will be submitted. The clerk may call the next case.